# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00381-CR

**Kimberly Haley, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
### NO. 9024025, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING

## O P I N I O N

Appellant Kimberly Haley appeals her conviction for possession with intent to deliver four grams or more but less than 200 grams of cocaine. *See* Tex. Health & Safety Code Ann. §§ 481.102(3)(D), .112(d) (West 2003). The jury assessed appellant's punishment at imprisonment for sixty-five years.

Appellant asserts the trial court erred in denying her motion to suppress evidence, in overruling her challenge of a prospective juror, and at the punishment phase of trial, in admitting inadmissible evidence and in erroneously instructing the jury. We will affirm the judgment of conviction but because of error at the punishment phase of trial, we will reverse and remand the cause to the trial court for a new trial on punishment only. *See* Tex. Code Crim. Proc. Ann art. 44.29(b) (West Supp. 2003).

**Search—No-knock Entry**

In her first point of error, appellant complains of the trial court's refusal to suppress evidence obtained after the police failed to knock and announce their presence and forcibly entered appellant's apartment to serve a search warrant for the apartment and to serve appellant's co-defendant Kristofer Marsh with an arrest warrant for the murder of Michael Adelman. An appellate court reviews a trial court's ruling on a motion to suppress under an abuse of discretion standard. *See Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002); *Oles v. State*, 993 S.W.2d 103, 106 (Tex. Crim. App. 1999). Appellate courts give great deference to a trial court's determination of historical fact. *Johnson v. State*, 68 S.W.3d 644, 652 (Tex. Crim. App. 2002); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). When, as here, the trial court does not file findings of fact, we assume the court made implicit findings that support its ruling, so long as those implied findings are supported by the record. *See Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). We review *de novo* mixed questions of law and fact that do not turn on the credibility and demeanor of witnesses. *Johnson*, 68 S.W.3d at 652; *Guzman*, 955 S.W.2d at 89.

The Fourth Amendment to the constitution protects "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. In evaluating the scope of Fourth Amendment rights, we must look to the traditional protections against unreasonable searches and seizures afforded by the common law at the time of the framing of the Constitution. *See Wilson v. Arkansas*, 514 U.S. 927, 931 (1995). Framers of the Fourth Amendment thought that the method of an officer's entry into a dwelling was among the factors to be considered in assessing the reasonableness of a search and seizure. *Id.* at

2

934. However, the Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests. *Id.* The common law principle of announcement was never stated as an inflexible rule requiring announcement under all circumstances. *Id.* The Supreme Court's unanimous opinion said: "We simply hold that although a search or seizure of a dwelling might be constitutionally defective if police officers enter without prior announcement, law enforcement interest may also establish the reasonableness of an unannounced entry." *Id.* at 936. The Supreme Court left "to the lower courts the task of determining the circumstances under which an unannounced entry is reasonable under the Fourth Amendment." *Id*. at 936.

It is the duty of a court confronted with the question to determine whether the facts and circumstances of the particular entry justified dispensing with the knock-and-announce requirement. *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997). In order to justify a "no-knock" entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence. *Id*. This standard—as opposed to a probable cause requirement—strikes the appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by no-knock entries. *Id*. The showing of a reasonable articulable suspicion of danger to make a no-knock entry is necessary. "This showing is not high, but the police should be required to make it whenever the reasonableness of a no-knock entry is challenged." *Id*. at 394-95.

3

A SWAT team, having as one of its duties assistance in high-risk warrant service, assisted the officers serving the warrants in this case. Police entered appellant's apartment that she shared with Kristofer Marsh to serve a warrant issued to search the apartment and a warrant issued for Marsh's arrest. Both the search warrant and the arrest warrant were issued in the same homicide case. The officers did not knock and announce their presence before entering the apartment; they used a "flash-bang" diversionary device outside of the apartment window, and they then used a heavy "breaching tool" to force open the apartment door. Appellant argues that the evidence is insufficient to show the officers had a reasonable concern for their safety so as to allow them to enter the apartment without knocking and announcing their presence. On the other hand, the State argues that the evidence and the circumstances show the forcible no-knock entry into appellant's apartment was justified.

Because of their apprehension of danger in serving the warrants, the officers maintained a surveillance of the apartment prior to the search. Also, the officers obtained from the apartment manager a copy of the floor plan of the three bedroom apartment. The officers asserted that their decision to forcibly enter the apartment without knocking and announcing their presence was to alleviate their concern for their own safety as well as the safety of the occupants of the apartment. The officers had reliable information that Marsh had in his possession in the apartment a nine millimeter Glock handgun and an SKS assault rifle. The officers knew of "a couple of previous weapons charges against Kristofer Marsh." The officers knew that Marsh and the appellant were then free on bond having been recently charged with a first degree felony offense; when arrested for that offense, they had a firearm in their possession. Most importantly, the officers had

4

evidence and knew that Marsh was capable of aggressive, violent behavior on slight provocation. The warrants that the officers intended to serve were issued on a showing of probable cause that Marsh, using a baseball bat, brutally beat and killed a strong, healthy young man. Marsh's provocation for killing the man was appellant's complaint to Marsh about the man's alleged misbehavior toward her on a night club dance floor. Both Marsh and appellant had boasted about Marsh's heinous criminal act.

Giving proper deference to the trial court's ruling refusing to suppress the evidence, we conclude that the trial court did not abuse its discretion in finding that the officers' no-knock, unannounced, forcible entry into the apartment was justified. The evidence and the circumstances support the court's implied finding that the officers had a reasonable suspicion that their own lives, and the lives of the occupants of the apartment, would be endangered if they knocked and announced their presence before entering the apartment to serve the warrants. Moreover, in our independent *de novo* review of the mixed questions of law and fact not depending on the credibility and demeanor of the witness, we find that the overruling of motion to suppress is supported by the evidence and circumstances shown. Appellant's first point of error is overruled.

**Juror Challenge**

In her second point of error, appellant insists that the trial court erred in overruling her challenge for cause of a prospective juror who was biased against the law of probation. Before an appellant can claim that she was harmed by a trial court's denial of a defense challenge for cause, the record must show that (1) she exhausted all of her peremptory challenges, (2) she requested more challenges, (3) her request was denied, and (4) she identified an objectionable person seated on the

5

jury upon whom she would have exercised a peremptory challenge. *Martinez v. State*, 17 S.W.3d 677, 682 (Tex. Crim. App. 2000); *Anson v. State*, 959 S.W.2d 203, 204 (Tex. Crim. App. 1997).

Appellant exercised a challenge for cause against prospective juror Jill Nabors on the ground that Nabors had a bias and prejudice against the law of probation, a law upon which appellant was entitled to rely. *See* Tex. Code Crim. Proc. Ann. art. 35.16(c)(1) (West Supp. 2003). However, appellant failed to identify an objectionable person seated on the jury upon whom she would have exercised a peremptory challenge. Nevertheless, appellant argues that the error she asserts was preserved in the trial court for appellate review. Even though the co-defendants unsuccessfully sought a severance because of incompatible defenses, the trial court granted appellant's and the co-defendant Marsh's "joint motion to incorporate and adopt all motions and objections and rulings thereon." Appellant, in reliance on this dubious practice, argues:

> While Appellant's counsel did not identify an objectionable juror who served as a result of the court's error, co-defendant Marsh's attorney indicated that he would have used an additional peremptory to strike juror Mary K. Allison. Before the trial started, the trial court had granted a joint defense motion whereby each defendant adopted the motions and objections of the other. In addition, counsel for co-defendant Marsh expressly adopted Appellant's challenge for cause to Nabors. Accordingly, the co-defendant's identification of Allison as an objectionable juror is constructively attributable to Appellant, also.

Assuming, without deciding, that the joint motion is applicable to jury *voir dire*, appellant's complaint on appeal does not comport with any complaint made in the trial court. Complaints asserted on appeal must comport with a trial complaint or nothing is presented for appellate review. *See Medina v. State*, 7 S.W.3d 633, 634 (Tex. Crim. App. 1999); *Rezac v. State*,

6

782 S.W.2d 869, 870 (Tex. Crim. App. 1990); *Hitt v. State*, 53 S.W.3d 697, 708 (Tex. App.—Austin 2001, pet. ref'd).

Appellant's co-defendant Marsh's challenge of Cynthia Horacek for cause was denied and he used one of his peremptory challenges against her. Marsh identified Mary K. Allison as an objectionable person seated on the jury upon whom he would have exercised a peremptive challenge. Marsh's complaint to the trial court was that he had to take an unacceptable juror *Mary K. Allison* as a result of the trial court's denial of his challenge for cause against *Cynthia Horacek*. Appellant's complaint on appeal, a complaint not made by either appellant or her co-defendant Marsh to the trial court, is that she was forced to take an unacceptable juror, *Mary K. Allison*, as a result of the trial court's denial of appellant's challenge for cause of *Jill Nabors*. Appellant's complaint on appeal was not preserved for appellate review in the trial court.

Even if appellant's complaint had been preserved for appellate review, it would have been without merit. During *voir dire* by both the State and the defense, Jill Nabors vacillated and was ambivalent concerning her willingness to consider a range of punishment including probation. After the termination of *voir dire* by counsel, the trial court examined some prospective jurors to clarify their equivocal answers to counsel's questions on *voir dire*. The trial court explained to Nabors that the range of punishment applicable to the charged offense could include probation; the court continued: "It is not whether you would give it. It is whether you could consider it." Nabors replied, "I could consider it." The court thanked Nabors and told her to have a seat. Appellant's counsel then said, "Were you going to add something to that?" Nabors replied: "I could consider it, but I won't approve of it." The court again thanked Nabors and told her to have a seat. There

7

were no follow-up questions by either counsel or the court following Nabors last equivocal answer. The trial court quite likely believed Nabors's answer was that although she did not necessarily agree with the law she would follow it and consider probation within the range of applicable punishment.

The denial or grant of a challenge for cause is within the discretion of the trial court and will not be overturned absent an abuse of discretion. *Mooney v. State*, 817 S.W.2d 693, 701 (Tex. Crim. App. 1991). When a trial court is faced with a vacillating prospective juror, elements such as demeanor and tone of voice are important factors in conveying the precise message intended; demeanor and tone of voice are not reflected by a cold record. Therefore, the trial court's decision is accorded great deference. *Id*. at 701. Giving proper deference to the trial court's ruling, we have examined the record and conclude that the trial court's ruling is supported by the record. *See Satterwhite v. State*, 858 S.W.2d 412, 415 (Tex. Crim. App. 1993). Appellant's second point of error is overruled.

### Punishment Phase—Evidence and Jury Charge

In her third point of error, appellant complains that over her objections at the punishment phase of the trial evidence of an extraneous offense was erroneously admitted and that the jury was given an incomplete, misleading and erroneous instruction relating to that evidence. Article 37.07 § 3(a) of the code of criminal procedure provides in relevant part:

> [E]vidence may be offered by the state and the defendant as to any matters the court deems relevant to sentencing including but not limited to . . . evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible . . . .

Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1) (West Supp. 2003).

8

For purposes of assessing punishment, the prosecution may offer evidence of any extraneous crime or bad act that is shown, beyond a reasonable doubt, either to have been (1) an act committed by the defendant or (2) an act for which he could be held criminally responsible. *Fields v. State*, 1 S.W.3d 687, 688 (Tex. Crim. App. 1999); *Arthur v. State*, 11 S.W.3d 386, 392 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Tex. Pen. Code Ann. § 7.02 (West 2003).

To establish an accused's guilt as a party to an offense, in addition to showing the primary actor committed the criminal offense, it must be shown that the accused had the specific intent to promote or assist the commission of the offense. *Lawton v. State*, 913 S.W.2d 542, 555 (Tex. Crim. App. 1995); *Tucker v. State*, 771 S.W.2d 523, 530 (Tex. Crim. App. 1988). The agreement, whether explicit or implicit, to commit a criminal offense must be made before or contemporaneously with the criminal offense. *See Pesina v. State*, 949 S.W.2d 374, 382 (Tex. App.—San Antonio 1997, pet. ref'd); *Miranda v. State*, 813 S.W.2d 724, 732 (Tex. App.—San Antonio 1991, pet. ref'd). Acts done after the offense is completed do not make the accused a party to the offense. *Morrison v. State*, 608 S.W.2d 233, 235 (Tex. Crim. App. 1980); *Pecina*, 949 S.W.2d at 383; *Guillory v. State*, 877 S.W.2d 71, 74 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd). The evidence must show that at the time of the commission of the offense, the parties were acting together, each doing some part of the common design. *Brooks v. State*, 580 S.W.2d 825, 831 (Tex. Crim. App. 1979). If the evidence shows mere presence of an accused at the scene of the offense,

9

or even his flight from the scene, then it is insufficient to sustain a conviction as a party to the offense. *Valdez v. State*, 623 S.W.2d 317, 321 (Tex. Crim. App. 1979); *Scott v. State*, 946 S.W.2d 166, 168 (Tex. App.—Austin 1997, pet. ref'd).

Standing alone, proof that an accused assisted the primary actor in making his escape is likewise insufficient, although accused's conduct may constitute an independent offense of hindering apprehension or prosecution. *Pesina*, 949 S.W.2d at 383; *Scott*, 946 S.W.2d at 168; *Guillory*, 877 S.W.2d at 74. While an agreement of parties to act together in common design can seldom be proved by direct evidence, it may be shown by circumstantial evidence or combined direct and circumstantial evidence. *Burdine v. State*, 719 S.W.2d 309, 315 (Tex. Crim. App. 1986); *Ex parte Prior*, 540 S.W.2d 723, 727-28 (Tex. Crim. App. 1976).

At the punishment phase of the trial, the State offered and the court admitted the testimony of twelve witnesses in their attempt to prove the murder of Michael Adelman.[1] We will

---

[1] Appellant timely objected to the admission of evidence of the extraneous offense of murder on grounds that the State did not have "good faith evidence" that would show beyond a reasonable doubt that appellant was guilty as a party to the murder, and that therefore, the evidence was inadmissible under the provisions of article 37.07 of the code of criminal procedure. That statute provides.

> Evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

Tex. Code Crim. Proc. Ann. art. 37.07 § 3(a)(1) (West Supp. 2003). After the court had admitted all of the testimony relating to the murder of Michael Adelman, appellant's counsel renewed his

10

summarize that evidence. On the night of October 5, 2000, appellant and her friend Ronnie Maxwell were in a downtown Austin nightclub. Michael Adelman, with whom neither appellant nor Maxwell were acquainted, was also in the nightclub. Both appellant and Maxwell danced with Adelman. When appellant became offended by Adelman's conduct, appellant called her boyfriend Kristofer Marsh. Marsh came to the nightclub and demanded that Adelman apologize to appellant and Maxwell. Marsh, unsuccessful in obtaining an apology from Adelman, left the nightclub and obtained an aluminum baseball bat, which he hid outside of the nightclub. The club was closing when Marsh returned. Marsh, appellant, and Maxwell were standing near the bar when appellant told Maxwell that "we are fixing to start some s - - t." About that time, Adelman walked past the appellant and she grabbed Adelman's chest and pinched his nipple. Adelman pushed appellant's hand aside, laughed and kept on walking. Before the club closed, Michael Girard, the club's owner and a friend of Adelman, thought that Adelman, although not drinking in his club, had earlier consumed too much alcohol to be driving. Girard asked his friend, Keith Ann Gorton, to assist him in taking Adelman to his apartment. Girard, accompanied by Adelman, drove Adelman's SUV to the apartment complex in Northwest Austin where Adelman lived. Gorton, driving Girard's SUV, followed Girard and Adelman to the apartment complex. When they entered the apartment complex, Girard noticed a white SUV that had been following them stop abruptly and enter the complex.

---

objections and counsel asked the trial court to instruct the jury not to consider any of the evidence relating to "the homicide of Mike Adelman . . . in that the State has wholly failed to comply with the dictates of Article 37.07 and show beyond a reasonable doubt Kim Haley's guilt of the elements of homicide."

Girard was concerned and, after parking Adelman's SUV, went to investigate. Adelman exited his SUV and was helping Gorton park Girard's large vehicle.

Marsh, appellant, and Maxwell left the club. Marsh retrieved the bat, but had no opportunity to confront Adelman outside of the club. Appellant and Maxwell got into Marsh's SUV and Marsh followed the SUVs driven by Girard and Gorton to the apartment complex where Adelman lived. When they reached the complex, Marsh parked, turned off the light, and left the engine running; appellant got in the driver's seat. Marsh took the bat and ran toward the area of the complex where SUV brake lights were visible.

Gorton testified that Adelman was standing close to the left front wheel of the vehicle she had been driving; he was directing her into a narrow parking slot. Gorton saw a man come running up out of the darkness carrying an aluminum baseball bat. The man came up behind Adelman and struck Adelman on the head one or two times before Adelman went down on the ground. Adelman was on his knees with his face on the ground and his arms were covering the back of his head. While Adelman remained on the ground, his assailant hit him with the bat several more times. Gorton testified that Adelman never turned around to look at his assailant and never attempted to fight back.

The man attacking Adelman appeared to be angry; he looked up and saw Gorton and proceeded to bash in the driver's side window, which shattered all over the car. Gorton crawled over the console into the back seat. Adelman's assailant ran toward and entered a white SUV, taking the bat with him. The white SUV then sped away. Marsh laughed and told appellant and Maxwell that

12

he just kept hitting him and hitting him and there was no way he was getting up. Appellant praised Marsh and kissed him.

After parking Adelman's SUV, Girard walked toward the entrance to the apartment complex. He saw a white SUV parked at the edge of an apartment building. During this investigation, Girard caught a glimpse of a man running through the dark carrying what looked like a shotgun. The man dodged behind a dumpster. Girard, fearing for his safety, walked around one of the apartment buildings. He heard glass breaking and heard Gorton yell his name. Girard ran to Gorton and Adelman and found Adelman on his knees on the ground, supporting his upper body with his face. Adelman was hunched over with his arms behind him and his head pointed toward the front of Girard's SUV. Adelman was bleeding from his nose, mouth, elbow and knees. Adelman was unable to talk but moaned from the pain of his injuries. Girard called 911.

Adelman was declared "brain dead," was removed from life support, and died on October 11, 2000. On October 12, Travis County deputy medical examiner Dr. Elizabeth Peacock performed an autopsy on Adelman's body. Injuries on Adelman's knees were consistent with his falling to his knees. There was a large bruised area on the back of his hand; he had a compound fracture of his right index finger and extensive contusions on his upper right arm. Dr. Peacock characterized those wounds as defensive wounds. Adelman suffered extensive skull fractures on the right side, subdural hemorrhage on the left side, and an extensive contusion behind his right ear. Dr. Peacock testified that it took a lot of force to break Adelman's skull as it had been broken. Adelman took three direct hits to his scalp; any of the blows behind Adelman's ear and on the right side of his head could have been fatal. Death was caused by cranial cerebral trauma. Dr. Peacock testified that

13

Adelman's injuries were consistent with his being struck on the head with a baseball bat and that a baseball bat could be a deadly weapon.

Police officers had no suspects in the commission of Adelman's murder until Nicholas Frescas and Jordan Baker called Crimestoppers after Thanksgiving. Both gave statements to police and testified at trial. Baker, Frescas's girlfriend, shared an apartment with appellant. In the evening on October 5, 2000, Baker and Frescas watched television in Baker's apartment; appellant and Marsh were not there. The following morning, Marsh and appellant entered Baker's bedroom and Marsh told Baker and Frescas that he had beaten somebody up who had been "messing" with appellant at a club. Marsh said he followed the guy home, crept up behind him, and beat him with a bat, indicating that he hit the victim several times. Marsh told them he hit the victim with a bat and "really f-----d him up." Frescas testified that Marsh was arrogant, cocky, and showed no remorse whatsoever. Baker saw Marsh appearing to remove blood from a baseball bat. Later, Frescas and Baker saw news reports that Adelman was in critical condition and then that he had died. They also saw posters in a club describing Adelman's assailant and his car; the descriptions matched Marsh and his car. Frescas, fearing for Baker's safety, insisted that appellant release Baker from her obligation under the apartment lease so that Baker could move. Appellant and Marsh agreed to release Baker's lease obligation. Frescas and Baker were afraid of Marsh because they knew he possessed a number of firearms and handguns. On Thanksgiving Day, Frescas visited his family in El Paso and Baker visited her family in Wichita Falls. After Baker and Frescas returned to Austin they decided to tell law enforcement officers what they knew about Adelman's murder. This prompted their calls to Crimestoppers.

14

At the time of this trial, Marsh had been convicted of Michael Adelman's murder. Appellant had not been charged with that offense.[2] The evidence shows that appellant's co-defendant Marsh murdered Michael Adelman; appellant could only be criminally responsible for Adelman's murder if the evidence showed beyond a reasonable doubt her guilt as a party to that offense. We conclude that the evidence introduced in this case at the punishment phase of trial, which we have summarized, is insufficient to prove beyond a reasonable doubt that appellant was guilty as a party to the offense of Adelman's murder. The court abused its discretion in admitting this evidence and in allowing the jury to consider this evidence in assessing appellant's punishment.

The error in admitting evidence of Adelman's murder against this appellant was compounded by the submission of an incomplete, misleading, and erroneous jury instruction relating to the complained of evidence. The code of criminal procedure provides that after the presentation of evidence at the punishment phase of trial has concluded, if the jury has the responsibility of assessing the punishment, the court shall give such additional written instructions as may be necessary and the order of procedure and the rules governing the conduct of the trial shall be the same as are applicable on the issue of guilt or innocense. Tex. Code Crim. Proc. Ann art. 37.07 § 3(b) (West 1981). Article 37.07 requires that evidence of prior crimes admitted at the punishment phase of trial may not be considered by the jury in assessing punishment until the jury is satisfied beyond a reasonable doubt that prior criminal acts are attributable to the defendant. *Fields*, 1 S.W.3d

---

[2] Prior to trial and during trial, appellant strenuously objected to being tried jointly with Kristofer Marsh. Appellant's motion and argument for severance urged several reasons for severance, particularly on grounds that evidence admissible against Marsh at the punishment phase of trial would not be admissible against her. Appellant's motion for severance was denied and she was tried jointly with Marsh.

15

at 688. In order to give consideration to the evidence of Adelman's murder in assessing appellant's punishment, it was necessary for the jury to first find that appellant was guilty beyond a reasonable doubt of committing that offense as a party. In relation to this issue, the jury was merely instructed:

> You are instructed that if there is testimony before you in this case regarding the defendant having committed other acts or participated in other transactions other than the offense alleged against her in the indictment in this case, that you cannot consider such other acts or transactions, if any, unless you first find and believe beyond a reasonable doubt that the defendant committed such acts or participated in such transactions, if any, but if you do not so believe, or if you have a reasonable doubt thereof, you will not consider such testimony for any purpose.

The charge submitted was incomplete, misleading, and erroneous in that it allowed the jury to consider the evidence of Adelman's murder in assessing appellant's punishment if appellant "participated in such transaction" without instructing the jury that "participation" in the murder was not legally sufficient unless appellant was criminally responsible for Adelman's death as a party. Under the instruction given, for example, the jury need only have believed that appellant's presence at the scene of the crime and fleeing from the scene with Marsh was sufficient "participation" in the offense for the jury to consider the evidence in assessing appellant's punishment. Appellant's presence at the scene and flight therefrom with Marsh would not be sufficient to make appellant a party to the offense. *See Valdez*, 623 S.W.2d at 321; *Tippitt v. State*, 41 S.W.3d 316, 323-28 (Tex. App.—Fort Worth 2001, no pet.); *Scott*, 946 S.W.2d at 169-70. Here the jury charge failed to define the law of parties and to instruct the jury of the necessity of finding appellant guilty beyond a reasonable doubt of murder as a party before evidence of the murder could be considered in assessing appellant's punishment.

16

Having decided that the jury instruction submitted was erroneous, we must now determine whether that error resulted in reversible error. This determination is made by applying the *Almanza* standard. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). Even though not preserved by an adequate objection, *Almanza* requires reversal of the judgment if the charge error results in "egregious" harm to a defendant. *Id*. For such error to require reversal, the defendant must have suffered actual "egregious" harm. *Arline v. State*, 721 S.W.2d 348, 352 (Tex. Crim. App. 1986). The error must be so harmful as to deny a defendant a fair and impartial trial. *Id*.; *Almanza*, 686 S.W.2d at 171.

The actual degree of harm must be determined in light of the entire charge, the state of the evidence, including the contested issues and weight of the probative evidence, the argument of counsel, and any other relevant information revealed by the record. *Almanza*, 686 S.W.2d at 171. The *Almanza* standard of review has been applied to the punishment phase of trial. *See Huizar v. State*, 12 S.W.3d 479, 484-85 (Tex. Crim. App. 2000); *Huizar v. State*, 29 S.W.3d 249, 251 (Tex. App. —San Antonio 2000, pet. ref'd) (on remand).

Here, a review of the whole record to determine the degree of harm resulting from the submission of the incomplete, misleading, and erroneous jury instructions shows that egregious harm resulted. Of course, the charge submitted included the erroneous charge that did not properly instruct the jury on the law of parties and the necessity of the jury finding appellant guilty beyond a reasonable doubt of Adelman's murder as a party before such evidence could be considered in assessing appellant's punishment. Appellant was eligible for probation, and the jury was instructed that appellant could only be given probation if her punishment for possessing cocaine was

17

imprisonment for ten years or less. In regard to the evidence, there were less than two hundred pages of testimony at the guilt or innocence phase of the trial, while at the punishment phase of trial there were more than four hundred pages of testimony. More than seventy percent of the testimony at the punishment phase related to the murder of Adelman. The bulk of the testimony at the trial related to the Adelman murder—not the charged offense. It appears that appellant was being tried for the uncharged murder offense. We have concluded that that evidence should not even have been admitted because it was not shown that appellant was guilty beyond a reasonable doubt of the offense as a party. In jury argument at the punishment phase, a substantial amount of the prosecutors' argument dwelt on the Adelman murder. The prosecutors asked the jury to assess the same substantial punishment against both defendants; the jury assessed both defendants' punishment at imprisonment for sixty-five years. A prosecutor argued that appellant was guilty of Adelman's murder and that her punishment should be "for everything they have done to the Adelman family, for everything they have done to Michael Adelman." Further, that Mr. Adelman's family could go to his grave and tell him justice had been served. "They will not bash anyone's head in. They will not kill someone else." The record reveals that, had appellant entered a guilty plea to the charged offense of possessing cocaine with intent to deliver, the State would have recommended punishment of imprisonment for thirty years.

Based on our review of the entire record including the charge, the state of the evidence, the contested issues, the weight of probative evidence, the argument of counsel, and the relevant information revealed by the record as a whole, we conclude that the error in the jury instruction at the punishment phase of trial caused egregious harm and denied appellant a fair and

18

impartial trial at the punishment phase. The error admitting evidence of the Adelman murder against appellant and the error in the jury instruction entitles appellant to a new trial on punishment. *See* Tex. Code Crim. Proc. Ann. art. 44.29(b) (West Supp. 2003).

## Victim Impact Evidence

In her fourth point of error, appellant insists that the trial court erred at the punishment phase of the trial in admitting victim impact evidence relating to the extraneous uncharged offense of the murder of Michael Adelman. The State contends that appellant has mischaracterized the complained-of testimony of Arleen Adelman as victim impact evidence, but argues that if the testimony is victim impact evidence, it is relevant and its value is not substantially outweighed by the danger of unfair prejudice.

At the punishment phase of trial, the State offered the testimony of twelve witnesses in an attempt to prove beyond a reasonable doubt that appellant and the co-defendant Marsh murdered Michael Adelman—an extraneous offense.[3] The last witness was Arleen Adelman, the mother of Michael Adelman. Before Arleen Adelman was allowed to testify about the evidence complained of, counsel for both defendants objected on the ground that Arleen Adelman's testimony would not be relevant. The objections were overruled. Counsel then asked the court "for a 403 balancing," which the court overruled.

---

[3] Marsh had been convicted previously of Michael Adelman's murder, but that conviction was not a final conviction at the time of the trial of this case. Appellant had never been indicted for Adelman's murder.

19

Michael Adelman's mother, Arleen Adelman, testified at length concerning the family's trauma caused by her son's hospitalization, suffering, and death:

Q. When you got to the hospital, tell me what you saw.

A. Michael Girard was there and there was a girl crying in the other room and I found out later—I didn't remember that that was Keith, but that was the girl that had witnessed what had happened that night. And she was hysterical, as we all were, and then they took us to see Mike. And he was just not moving or speaking or—his eyes were open, but we wasn't seeing anything.

Q. Was he in a hospital bed?

A. Yes ma'am, with many plugs and tubes and everything imaginable. His head was shaved, which was such a shock, but there were staples all across the top of his head where his scalp had been fractured. I remember thinking how could his head be broken open that way. But they had an intracranial module in his head by the time we saw him, so there was a big plug on top of his head where they could monitor his swelling and brain activity.

Q. Prior to seeing him, Ms. Adelman, was your son a pretty healthy, fit person?

A. He was very healthy. He was very conscious about his health. He didn't smoke. He didn't do drugs. He was always working out. I am sure he worked out even when he traveled. He would make sure he stayed at hotels where there was a gym. He loved sports. He was very, very active in every sport.

Q. When you saw him like this, were you able to communicate with him at all.

A. No, ma'am.

Q. Was your family and were there friends there?

A. There were friends there all the time. We were only allowed to go in once every hour or set times that we could go in. We had to keep the activity down because it seemed like a lot of his friends would want to come in and talk to him and there was a lot of crying going on and we would watch the gauge and it would move his intracranial pressure. So we were told to keep kind of quiet. But we were praying. We had priests there. We had a lot of people going in and out.

20

Q. It sounds like he was in an intensive care unit, is that right?

A. Yes, ma'am, the trauma unit.

Q. How long was he there?

A. He died on the sixth day, so I guess he was there five days.

Q. When he was there, was there any indiction that he might get better?

A. Yes, ma'am. We were real hopeful at one point because he had started moving around and his eyes were tracking us. He seemed to have messages that he was getting across. He kept moving his hand and I know he was telling me to undo the restraint on his arm. He was trying to pull out plugs and tubes and things, and he was fighting so hard to live.

Q. Was there—did you get information—tell me, did that change?

A. Yeah. We thought he was getting better. I had even been told that we should try to look for a therapy center, that he probably would not—he wouldn't have been able to speak or possibly walk. We knew the damages were dreadful, but we did think he was doing better and we left the hospital that night.

He was doing a lot of movement and stirring a lot. He was trying to get out of the bed and he was moving to the end of the bed. I remember once my husband kind of held him down and we kept telling him that he was all right and that we thought he was coming out of the coma. I guess he was still in a semi-coma.

But that night when we went home, a nurse called me and said that we had better come back to the hospital, that he had taken a turn for the worse.

And we had already been approached by a pulmonary doctor because they did remove him from the respirator and they had taken the intracranial module out of his head. So that was a good sign, but then they felt like fluid was developing in his lungs so they needed to put him back on the respirator. So the pulmonary doctor said things aren't looking good.

I remember saying oh, he is so healthy and so strong, he can lick pneumonia. But then a neurologist called and said that they needed to do another—I don't know if it was a CT scan or some type of brain activity test and they wold have to put the module back into his skull. Then they found a brain stem bleed and

21

so due to that bleeding he went into a deeper coma and his eyes no longer tracked us or he didn't look at us. He just laid there and never moved again.

Q. From that point, ma'am, did you get information that he was then declared brain dead?

A. Yes, ma'am.

Q. And did the family have to make a decision?

A. We knew both Matt's and Mike's wishes concerning their organs. They had it on their driver's license. It was a hard decision, but we knew that's what Mike would have done. Mike would have done anything for his friends or his family. He was that type person. He would have been proud that he could give life to other people.

Q. So Mike Adelman donated organs?

A. We have heard from the ex-policeman that has his heart and he is doing very well. He just says it was a miracle. There are three other people that received kidneys and liver and other organs. They are all doing well. We haven't heard from them.[4]

Following Arleen Adelman's testimony, counsel renewed their objections and asked the court to instruct the jury to disregard the testimony. The court refused to so instruct the jury.

> The danger of unfair prejudice to a defendant inherent in the introduction of "victim impact" evidence with respect to a victim not named in the indictment on which he is being tried is unacceptably high. The admission of such evidence would open the door to admission of victim impact evidence arising from *any* extraneous offense committed by a defendant. Extraneous victim impact evidence, if anything, is more prejudicial than the non-extraneous victim impact evidence . . . . [S]uch evidence is irrelevant under Tex. R. Crim. Evid. 401.

---

[4] The record reflects that the prosecutor was crying during her examination of Arleen Adelman.

22

*Cantu v. State*, 939 S.W.2d 627, 637 (Tex. Crim. App. 1997); *see also Boston v. State*, 965 S.W.2d 546, 550-51 (Tex. App.—Houston[14th Dist.] 1997, no pet.). Appellant was being tried for the offense of possession of cocaine with the intent to deliver—not for murder. The indictment charging the cocaine possession offense named no victim. It was error to admit evidence in the nature of victim impact evidence relating to the extraneous offense of murder. Moreover, before being admitted in a proper case, victim impact evidence is subject to the limitations imposed by Texas Rule of Evidence 403. *Ripowski v. State*, 61 S.W.3d 378, 390 (Tex. Crim. App. 2001); *Mosley v. State*, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998).

Having determined that the evidence was erroneously admitted, we must decide whether the admission of this evidence was so harmful as to require a new trial on punishment. The error complained of is not of constitutional dimensions. Other than constitutional error, any error that does not affect appellant's substantial rights must be disregarded. Tex. R. App. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict, *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997); *Roberts v. State*, 29 S.W.3d 596, 602 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd), or leaves one in grave doubt whether it had such effect. *Espinosa v. State*, 29 S.W.3d 257, 259 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). One of the state's witnesses, who testified before Arleen Adelman, was Dr. Elizabeth Peacock, the deputy medical examiner; she testified about Michael Adelman's injuries, the cause of his death, and that his organs had been donated for the use of others. During closing jury argument, the prosecutor characterized the complained of testimony of Arleen Adelman as victim impact evidence, arguing:

23

The call to his family, the call at 3:00 o'clock in the morning as his family gets the phone call that their strong, healthy son has been injured. And as they go and they tell and they rush to the hospital praying please, please, he will be okay. What do they see?

This is what the mother and father see. This is what happens to Michael Adelman. So as the hospital is filled with family and friends as they comfort him, as the mother and father touch him and say it's going to be okay, mom is here. It's going to be okay. Dad is here. You are going to pull out of this. Every day praying, praying and hoping. God, help our baby.

I believe the way that this—everything you have heard that they both should get, absolutely without a question should get a life sentence, both of them. Kristofer Marsh life, Kim Haley life. For everything they have done to this community, for everything they have done to the Adelman family, for everything they have done to Michael Adelman.

You see, ladies and gentlemen, if that happens, then the family can go to the grave of Michael Adelman—because they do that. They go talk. They can't touch him. They can't see him, but they talk to him. They can go to his grave and they did say, son, we know you are not coming back to us. See, we can't bring him back, but we have asked for one thing and Travis County responded. We only want justice. Do you know what, son, we got justice, Kimberly Haley and Kris Marsh will sell no more drugs in this community. They will not hurt anybody else. They will not bash anyone's head in. They will not kill someone else. They will not do any other vicious act because justice was served. So Mike, you can now rest in peace. You can now rest in peace. Justice has been served in this case. We are now protected. Rest in peace.

The prosecutor in closing jury argument stressed and overemphasized the erroneously admitted victim impact evidence relating to the extraneous murder offense; obviously it was to justify the State's demand that the jury assess the most harsh and severe punishment for the charged offense of possessing cocaine.

In determining the magnitude of the harm resulting from the erroneous admission of the complained of evidence, we have examined, reviewed and considered the whole record. We

24

conclude that the error in admitting the victim impact evidence relating to the extraneous offense of murder had a substantial effect on the jury's verdict. There can be little doubt that the erroneously admitted evidence, and the way it was used by the State, particularly in jury argument, substantially affected and influenced the jury in assessing appellant's punishment. We cannot disregard as harmless error the erroneous admission of this evidence relating to the extraneous murder offense. Appellant's fourth point of error is sustained.

The judgment of conviction is affirmed as to appellant's guilt, but the judgment on punishment is reversed and the cause is remanded to the trial court for a new trial on the punishment phase of the trial. *See* Tex. Code Crim. Proc. Ann. art. 44.29(b) (West Supp. 2003).

 

 

_____

Carl E. F. Dally, Justice

Before Chief Justice Law, Justices Patterson and Dally[*]

Affirmed in Part; Reversed and Remanded in Part

Filed: August 14, 2003

Publish

---

[*] Before Carl E. F. Dally, Judge (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).