ACCEPTED
03-15-00231-CR
6570243
THIRD COURT OF APPEALS
AUSTIN, TEXAS
8/19/2015 4:30:45 PM
JEFFREY D. KYLE
CLERK

CAUSE NO. 03-15-00231-CR

_____

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
8/19/2015 4:30:45 PM
JEFFREY D. KYLE
Clerk

# IN THE COURT OF APPEALS
## FOR THE THIRD DISTRICT OF TEXAS
### AUSTIN DIVISION

_____

| | |
|---|---|
| JONATHAN LEE FEHR | § |
| | § |
| v. | § |
| | § |
| THE STATE OF TEXAS | § |

_____

## APPELLANT'S BRIEF

_____

Justin Bradford Smith
Texas Bar No. 24072348
Harrell, Stoebner, & Russell, P.C.
2106 Bird Creek Drive
Temple, Texas 76502
Phone: (254) 771-1855
FAX: (254) 771-2082
Email: justin@templelawoffice.com

ATTORNEY FOR APPELLANT

ORAL ARGUMENT REQUESTED

# IDENTITY OF PARTIES AND COUNSEL

**Appellant**
> Jonathan Lee Fehr

**Appellant's Counsel**
> Justin Bradford Smith
> Harrell, Stoebner, & Russell, P.C.
> 2106 Bird Creek Drive
> Temple, Texas 76502
> Phone: (254) 771-1855
> FAX: (254) 771-2082
> Email: justin@templelawoffice.com

**Appellant's Trial Counsel**
> Richard D. Mock
> Trey Brown
> 400 South Main
> Burnet, Texas 78611
> Telephone: 512-756-2931
> Fax: 512-756-2933
> Email: trey@mockandbrown.com

**Appellee**
> The State of Texas

**Appellee's Trial Counsel**
> Anthony Dodson
> Llano County Assistant District Attorney
> P.O. Box 725
> Llano, Texas 78639
> Telephone: (325) 247-5755
> Fax: (325) 247-5274

**Appellee's Appellate Counsel**
> Gary W. Bunyard
> Llano County Assistant District Attorney
> Address, Phone, and Fax Same As Above
> Email: g.bunyard@co.llano.tx.us

## TABLE OF CONTENTS

Identity of Parties and Counsel……………………….…………………………... 2

Table of Contents…………………………………………………………..3-5

Index of Authorities…………………………………………………………..6-8

Statement of the Case……………………………………………………...9

Issues Presented………………………..…...…………………….…………….9

    ISSUE ONE:  The evidence is legally insufficient to support Appellant's conviction for burglary as the principal actor because there is no evidence that, by his own conduct, he entered Shane Pope's habitation…………………………………….....9

    ISSUE TWO:  The evidence is legally insufficient to support Appellant's conviction for burglary under the law of parties because there is no evidence that Brittany Anderson entered Shane Pope's residence with intent to commit theft, that she in fact committed or attempted to commit theft when she entered the residence, or that there was an agreement with Appellant before the burglary to commit the burglary……..…………..9

Statement of Facts……………………………………………………10-18

Summary of the Argument……………………………..………………...18-19

    ISSUE ONE:  The evidence is legally insufficient to support Appellant's conviction for burglary as the principal actor because there is no evidence that, by his own conduct, he entered Shane Pope's habitation…………………………………...18

Argument……………………………………………………........20-30

Standard of Review…………………………..…………………………….20

Law of Burglary………………………………………………………...21

Application…………………………………………..…………………...21-30

    1. Appellant did not enter Pope's habitation…………………………...21-22

    2. Red Herrings: the Carport and the Television……………………...22-30

        A. The Carport is not a Habitation or Part of a Habitation…………22-29

        B. Nothing shows Appellant himself participated in removing the television from Pope's residence, whenever that occurred……...29-30

Conclusion…………………………………………………………………...30

Summary of the Argument………………………………………………….30-32

    ISSUE TWO: The evidence is legally insufficient to support Appellant's conviction for burglary under the law of parties because there is no evidence that Brittany Anderson entered Shane Pope's residence with intent to commit theft, that she in fact committed or attempted to commit theft when she entered the residence, or that there was an agreement with Appellant before the burglary to commit the burglary……..…………30

Argument……………………………………………………………………32-46

Standard of Review…………………………………………………………32-33

Law of Burglary and Law of Parties………………………………………..33-35

    1. Burglary……………………………………………………………..33-34

    2. Law of Parties………………………………………………………34-35

Application…………………………………………………………………35-46

    1. There is no evidence that Brittany entered the residence with intent to commit theft, or that, in this regard, Appellant entered into an agreement with Brittany before the burglary to commit the burglary…………..35-36

2. There is no evidence that Brittany attempted to commit or did commit theft after entering Pope's residence, that Appellant had anything to do with any other possible burglary of Pope's residence, or that Appellant and Brittany entered into any agreement prior to the burglary to commit the burglary……………………………………………….……36-41

3. Addressing possible counterarguments from the State……………...41-46

Conclusion………………………………………………………………...46

Prayer…………………..……………………………………………….........46

Certificate of Compliance………………………………………………...47

Certificate of Service…………………………………………………...48

# INDEX OF AUTHORITIES

**United States Supreme Court:**

*Jackson v. Virginia*, 443 U.S. 307 (1979)……………………………..20, 32-33, 45

**Court of Criminal Appeals:**

*Brooks v. State*, 323 S.W.3d 893
    (Tex. Crim. App. 2010)…………………………………………20, 32-33, 45

*Clayton v. State*, 235 S.W.3d 772
    (Tex. Crim. App. 2007)…………………………………………...20, 33

*Davila v. State*, 547 S.W.2d 606
    (Tex. Crim. App. 1977)…………………………………………..21-22, 34

*Day v. State*, 534 S.W.2d 681
    (Tex. Crim. App. 1976)…………………………………23, 27-28, n. 10

*Hardesty v. State*, 656 S.W.2d 73
    (Tex. Crim. App. 1983)……………………………………………41-42

*Hooper v. State*, 214 S.W.3d 9
    (Tex. Crim. App. 2007)…………………………………………...20, 33

*St. Julian v. State*, 874 S.W.2d 669
    (Tex. Crim. App. 1994)………………………………………….28

*Malik v. State*, 953 S.W.2d 234
    (Tex. Crim. App. 1997)…………………………………………...20, 33

*McKnight v. State*, 399 S.W.2d 552
    (Tex. Crim. App. 1966)……………………………………………43

*Morrison v. State*, 608 S.W.2d 233
    (Tex. Crim. App. 1980)………………………………34, 36, 39, 41, n. 12

*Nichols v. State*, 479 S.W.2d 277
    (Tex. Crim. App. 1972)…………………………………...40, n. 14

*Prather v. State*, 128 Tex. Crim. 342, 81 S.W.2d 528
　　(1935)……………………………………………………………………42

*Swain v. State*, 583 S.W.2d 775
　　(Tex. Crim. App. 1979)………………………………………………27-28

*Urtado v. State*, 605 S.W.2d 907
　　(Tex. Crim. App. 1980)………………………………35-36, 39, 41

**Texas Courts of Appeals:**

*Darby v. State*, 960 S.W.2d 370
　　(Tex. App.—Houston [1st Dist.] 1998, pet. ref'd)……………………..24, 26

*England v. State*, 727 S.W.2d 810
　　(Tex. App.—Austin 1987, no pet.)………………………………..42-43

*Espinoza v. State*, 955 S.W.2d 108
　　(Tex. App.—Waco 1997, pet. ref'd)………………………………36-37

*Haley v. State*, 113 S.W.3d 801
　　(Tex. App.—Austin 2003)……………………………………....41

*Hartsfield v. State*, 305 S.W.3d 859
　　(Tex. App.—Texarkana 2010, pet. ref'd)………………………………20, 32

*Jones v. State*, 690 S.W.2d 318
　　(Tex. App.—Dallas 1985, pet. ref'd)………………………...24-26, n. 8

*Tennyson v. State*, No. 11-92-107-CR, 1993 WL 13141619
　　(Tex. App. Eastland, June 24, 1993) (not designated for publication)…23-24

*White v. State*, 630 S.W.2d 340
　　(Tex. App.—Houston [1st Dist.] 1982, no pet.)………………………..24, 26

*Woods v. State*, 01-92-00739-CR, 1993 WL 177627
　　(Tex. App.—Houston [1st Dist.] May 27, 1993, pet. ref'd)
　　(not designated for publication)………………………………...23-24

**Constitutions/Statutes/Rules**

Tex. Pen. Code § 7.01(a)…………………………………………………………...21, 34

Tex. Pen. Code § 7.02(a)(2)………………………………………………….34-36, 41

Tex. Pen. Code § 30.01…………………………………………………22-23, 25, n. 8

Tex. Pen. Code § 30.02………………………………………..21-22, 28-29, 33-34, 41

Tex. Pen. Code § 31.01(4)(B)…………………………………………………..30

Tex. Pen. Code § 31.03(b)(2)………………………………………………...29-30, 35

**Other Jurisdictions**

*Jefferson v. State*, 977 So.2d 431
    (Miss. Ct. App. 2008)……………………………………………………27, n. 9

**Secondary Sources**

43 A.L.R.2d 831……………………………………………………….......27, n. 9

http://www.merriam-webster.com/dictionary/building.................................25, n. 8

http://www.merriam-webster.com/dictionary/carport....................................25, n. 7

http://www.merriam-webster.com/dictionary/outbuilding.............................25, n. 8

## STATEMENT OF THE CASE

Nature of the Case:     This is an appeal from a judgment of conviction for burglary of a habitation following a jury trial. (I C.R. at 63-64).

Judge/Court:            Judge Evan Stubbs, 33rd District Court, Llano County. (I C.R. at 63-64).

Pleas:                  Not Guilty. (I C.R. at 63) (IV R.R. at 6).

Trial Court Disposition: Following the jury's verdict finding Appellant guilty of burglary of a habitation, (I C.R. at 52; 63-64) (VI R.R. at 80), the jury assessed punishment of fifteen years in the Texas Department of Criminal Justice and a fine of $7,500, (I C.R. at 57; 63-64) (VII R.R. at 41), and the trial court imposed the sentence. (VII R.R. at 41-42) (I C.R. at 63-64).

## ISSUES PRESENTED

ISSUE ONE: The evidence is legally insufficient to support Appellant's conviction for burglary as the principal actor because there is no evidence that, by his own conduct, he entered Shane Pope's habitation.

ISSUE TWO: The evidence is legally insufficient to support Appellant's conviction for burglary under the law of parties because there is no evidence that Brittany Anderson entered Shane Pope's residence with intent to commit theft, that she in fact committed or attempted to commit theft when she entered the residence, or that there was an agreement with Appellant before the burglary to commit the burglary.

9

## STATEMENT OF FACTS

When Shane Pope stopped at his house after work around five p.m. on October 7, 2013, he was certain his home had not been burglarized: the house was not ransacked and he did not notice his belongings missing. (IV R.R. at 20-21; 27-28) (V R.R. at 17; 26). After feeding his dogs and staying for perhaps fifteen minutes to half an hour, he left to spend the night at his girlfriend's house. (IV R.R. at 21) (V R.R. at 18).

The next day, he noticed $600 missing from his bank account, and when he returned home late at night he noticed his lawnmower and trailer were missing from the carport where he kept them. (IV R.R. at 22-26). Upon entering his home, which showed no signs of forced entry, he found his belongings rifled through[1] and several items missing, including a television, CDs, DVDs, a stereo, guns, an Explode boombox, three checkbooks, Bushnell and Simmons binoculars, and so forth. (IV R.R. at 26-33). Because he was absent from his home for a specific period between October 7th and October 8th of 2013, and because he was certain his house had not been burglarized by the time he briefly stopped there on October 7th, Pope was certain the burglary occurred "either between 5:30 October 7th to 10:15 October 8th." (IV R.R. at 21) (V R.R. at 17; 26).

---

[1] It looked like "people were [sic] going through stuff…pictures [had been] moved and books [had been] knocked over". (IV R.R. at 28).

Pope testified the $600 check that was cashed "didn't match the ones that were in [his] pickup"; he kept his other checks, which were stolen during the burglary, in his master bedroom closet. (IV R.R. at 24-25; 31). Although he discovered this draft on October 8th, the day it was processed, the check was indisputably cashed on October 7, 2013 at 4:03 p.m.—before his home was burglarized. (IV R.R. at 23-25) (V R.R. at 17; 26-27) (VI R.R. at 26) (Defendant's Ex. 1). The reason for the date discrepancy is because all checks cashed after 2 p.m. are processed on the next business day. (VI R.R. at 26).

Pope contacted the police, telling them he knew who broke into his home, which led to police investigating Appellant and his girlfriend (who was also Pope's half-sister[2]), Brittany Anderson, on October 9, 2013 at Appellant's trailer and shop.[3] (IV R.R. at 19-20) (V R.R. at 33; 36-39; 49) (State's Ex. 25-26). Brittany answered the trailer door after Lieutenant Glenn Williams knocked, and denied knowing anything about cashing her brother's check and burglarizing her brother's house. (V R.R. at 38-39). Appellant, who came from his nearby shop, denied knowing anything about the stolen items, and denied having a riding lawnmower

---

[2] Asked if he and Brittany were close, Pope replied, "Not really." (IV R.R. at 20). He did not know the last time she visited his home and did not think she ever had, nor was he certain about her age. (IV R.R. at 19-20) (V R.R. at 23-24). Both, however, clearly interacted since Pope saw Appellant at his mother and father's house, suggesting Brittany brought him there. (V R.R. at 18-19).

[3] Although not clear from the testimony, perhaps Pope suspected Brittany's involvement because of her connection to the $600 withdrawal from his account. *See* (Defendant's Ex. 1) (V R.R. at 38).

11

or knowing anything about a stolen trailer. (V R.R. at 39-40). When asked about the 55-inch Samsung television stolen from Pope's residence, Appellant stated his television was on the ground outside the trailer (Lieutenant Williams acknowledged there was a television on the ground), and his trailer was too small to have a television that large. (V R.R. at 40-41). Appellant refused Lieutenant Williams consent to search his trailer, but gave consent to search the rest of his premises. (V R.R. at 42-43). As a result, Lieutenant Williams found a trailer matching the description of Pope's trailer that was "freshly painted, partially painted with green paint", and that had been "obliterated by a welding rod" on the top of the neck on the "tongue" of the trailer. (V R.R. at 43-44) (State's Ex. 14-21). He noticed "fresh lawnmower-type tire tracks" on the trailer bed. (V R.R. at 44).

Lieutenant Williams took the trailer to the sheriff's office, but returned with Investigator Bill Boyd and Probation Officer Quinn Wilson. (V R.R. at 49). The latter came along to "do an inspection on the residence since Brittany was on probation at the time." (V R.R. at 49). When the officers arrived, Appellant was outside and Brittany was in Appellant's trailer where she lived. (V R.R. at 169-170). Appellant helped law enforcement gain entry to the trailer by prying its door open with a screwdriver. (V R.R. at 172).

Upon entering, officers found a large flat screen television that both Lieutenant Williams and Appellant thought was 42-inches. (V R.R. at 52; 72). However, after conducting proper measurements, Lieutenant Williams found the screen size to be 55-inches. (V R.R. at 72-73). Other facets of the television distinguished it as Pope's, such as distinctive wall mountings and its compatibility with the remote control (which was not stolen) that came with the television. (V R.R. at 34-37) (State's Ex. 12 and 13). Pope also identified the television as his. (V R.R. at 56). Appellant told Lieutenant Williams the television belonged to his sister, and Appellant provided no explanation for why the television was there when earlier he had said he did not have one. (V R.R. at 53). However, both Lieutenant Williams and Appellant mistakenly had thought the television was 42-inches. (V R.R. at 72). The only item belonging to Pope that officers removed from Appellant's trailer was the television.[4] (V R.R. at 173).

The only witness to the alleged burglary who testified at trial was Danny Napolez, who maintained that he road along but did not participate. (V R.R. at 110-11). According to Napolez, when he arrived at Appellant's residence on the day of, but before, the burglary, there was already a flat-screen television in Appellant's trailer that he had not seen before. (V R.R. at 112; 126-127). He

[4] Apparently Investigator Boyd observed two pairs of binoculars—one Bushnell and one Simmons—in Appellant's trailer, but these were not shown to be the same ones alleged to have been stolen from Pope. (IV R.R. at 31) (V R.R. at 80-82). Napolez also testified Appellant gave him an Explode boombox months later, but this also was not shown to be the same Explode boombox alleged to have been stolen from Pope. (IV R.R. at 27; 32) (V R.R. at 113-114).

asked Appellant "Where did y'all get this?", to which Appellant replied that the television was Brittany's. (V R.R. at 112).

At some point, Brittany "said she got in an argument with her brother and that she needed to go pick up a…few stuff of her's [sic]", which provided the impetus for going to Pope's house. (V R.R. at 113). Once there, Brittany went inside and "said to load [the riding lawnmower and/or trailer] because she said it was her's. [sic]" (V R.R. at 111; 114-115). Appellant did so. (V R.R. at 114).

Napolez testified he and Appellant then "waited til [Brittany] came out", (V R.R. at 111-112), but did not testify she came out with anything. (V R.R. at 104-160). Nor did he testify that Appellant, Brittany, and he returned to Appellant's residence and unloaded anything but the trailer and the lawnmower. (V R.R. at 115; 125-127; 141-145; 150-152). According to Napolez, when they returned to Appellant's residence, Appellant began welding and painting the trailer. (V R.R. at 150-151). Then, Brittany, Appellant, and Napolez left for the bank, where Napolez refused to sign a check because "[i]t was a forgery", so Brittany signed instead and cashed it. (V R.R. at 115-117; 126-127; 150-151). Napolez did not know whose check was being cashed, did not see the name on the check, and was not told that it came from the alleged burglary of Pope's house. (V R.R. at 117-118).

Napolez's ability to put together a detailed timeline was in doubt (perhaps because of his drug use), but he was unequivocal about the overall sequence: when he arrived at Appellant's residence a flat-screen television was already there, after that the three traveled to Pope's residence to pick up the lawnmower and trailer, after that they returned to Appellant's residence and dropped these items off, and after that they went to the bank. (V R.R. at 112-115; 125-127; 141-145; 147-151). Napolez also denied signing a receipt evidencing him selling Appellant the lawnmower (V R.R. at 118-120; 139-141) (Defendant's Ex. 2).

On October 8, 2013, Glenn Jolly purchased the lawnmower from Appellant for $350, and Appellant claimed he had purchased it for $400 from someone who needed money. (V R.R. at 94-97; 99) (Defendant's Ex. 2). When Jolly bought the lawnmower sometime after 1:30 p.m. or 2 p.m., Bobby Wisdom and Buddy Jarrett were present but he did not notice if "a Spanish guy" was there. (V R.R. at 102-103).

Appellant called Bobby Wisdom in his defense, who testified that he spent the better part of October 7, 2013 working with Appellant to change a transmission for someone named "Buddy".[5] (V R.R. at 178-180). Wisdom did not see Appellant's truck, but did affirm Appellant had to ask Buddy to get Appellant

---

[5] This would be Buddy Jarrett, an alibi witness under the State's subpoena whose failure to appear at trial was the subject of Appellant's motion for new trial. (V R.R. at 6-11; 222-234) (VI R.R. at 7; 17-18) (VIII R.R. at 4-18) (Defendant's Ex. 8).

some water because Appellant did not have a ride. (V R.R. at 181). Wisdom spent all day from 9 a.m. to 4:30 p.m. in Appellant's shop, only stepping out in front. (V R.R. at 197-198). Just after Wisdom left and as he was walking down the road, Appellant's father drove up. (V R.R. at 182). When Wisdom left, Pope's trailer and lawnmower were not at Appellant's property. (V R.R. at 183).

Later that night, around 8:30 or 8:45 p.m., Wisdom received a call from Brittany from which he received the impression that he needed to come help unload a television. (V R.R. at 182-183). When he arrived, the television was already unloaded and was in the trailer on the couch, while Appellant was still working in his shop. (V R.R. at 183-184). At that time, there was a John Deere lawnmower and trailer at Appellant's shop. (V R.R. at 184). Wisdom saw Napolez sitting on the trailer painting the "top rail of the hang line". (V R.R. at 184; 186; 199-200). Wisdom left but returned the next day and was present when the lawnmower was sold. (V R.R. at 184-185; 187). The State contested Wisdom's testimony vigorously (e.g., V R.R. at 189; 191-195; 197-198), and according to the hearing on Appellant's motion for new trial, the jury found him a "totally unbelievable witness." (VIII R.R. at 9-10).

Appellant's father testified on his behalf, saying he went to Appellant's property on October 7, 2013, sometime around 4:30 or 5 p.m., and left between 6:00 and 7:00 p.m. (V R.R. at 208). Appellant was "working on a white Ford car

and another guy" was there whose name Appellant's father believed was Buddy Jarrett. (V R.R. at 209). He did not see Appellant's vehicle at Appellant's shop, nor did he see "anything that wasn't [his] out there." (V R.R. at 209-210). When Appellant's father left, he saw Brittany and Danny Napolez in Appellant's truck at red light. (V R.R. at 211). He could not, however, "tell if they were pulling anything or if the truck had anything in it or not." (V R.R. at 212).

In the State's rebuttal, a bank teller, Brook Johanson, testified that she saw Appellant in his truck while Brittany cashed the $600 check. (VI R.R. at 19-20; 22; 25-27; 30; 34-35). According to Johanson, the writing on the check resembled Appellant's "scribbling handwriting". (VI R.R. at 29-30). On cross-examination, however, she admitted that a specimen of Appellant's handwriting did not match the forged check. (VI R.R. at 39) (State's Ex. 30) (Defendant's Ex. 7).

During the trial but outside the presence of the jury, the Court commented that "[c]learly, if there was a burglary, there was a single burglary based on the evidence that's been presented", and observed that the Court did not "recall hearing any direct testimony that he [Appellant] entered the habitation". (V R.R. at 166; 221).[6] As a result, the Court's charge authorized the jury to convict Appellant, both as the primary actor and as a party, of a single burglary committed

---

[6] During closing arguments the prosecutor informed the jury of his tardy realization that, due to Appellant's presence on October 7, 2013 when the forged check was passed, "Mr. Pope's house had been burglarized more than once." (VI R.R. at 76). This does not conflict, however, with the trial judge's opinion that there was "a single burglary" shown by the evidence. *See* note 12, *infra*.

in either of two ways. (I C.R. at 46-51). First, by intentionally or knowingly entering Pope's house without his effective consent, and therein attempting to commit or committing theft of Pope's television. (I C.R. at 49). Second, by entering Pope's house without his effective consent and with intent to commit theft. (I C.R. at 49). The jury returned a guilty verdict, and after a punishment hearing, assessed his punishment at fifteen years with a $7,500 fine. (I C.R. at 52; 57). The Court sentenced Appellant in accordance with the jury's verdict. (VII R.R. at 41-42).

## SUMMARY OF THE ARGUMENT

ISSUE ONE: The evidence is legally insufficient to support Appellant's conviction for burglary as the principal actor because there is no evidence that, by his own conduct, he entered Shane Pope's habitation.

The only evidence in the record of a potential burglary comes from Danny Napolez, who, rather than testifying that Appellant entered Pope's habitation, testified that Appellant waited in the car until Brittany returned from entering the habitation. As such, it is impossible for Appellant to have committed burglary by his own conduct as the principal actor, because there is no evidence that he himself entered Pope's habitation, and entry is an essential element of burglary. This is true of both subsections of the burglary statute under which the State sought a conviction.

18

Stealing the lawnmower and trailer from Pope's carport could not support the burglary conviction because a carport is not a "habitation", nor (so far as the facts disclose) a structure "appurtenant to or connected with" a habitation; it is not even an enclosed structure that could constitute a building. No published opinion in Texas holds that a carport is part of a habitation, and the two unpublished opinions that do so hold are based on opinions with dissimilar facts and faulty reasoning. Yet, even if we accept the definition of "appurtenant" from one case, the facts here do not show that the carport meets that definition. Instead, this Court should following the implications of two Court of Criminal Appeals cases and conclude that a carport, at least on these facts, is not a habitation or a part of one. If the Court chooses instead to hold that the carport was part of Pope's habitation, then nothing shows Appellant entered the carport to hook up the trailer on which the lawnmower sat.

Neither is the fact that the television was found in Appellant's residence sufficient to support Appellant's conviction based on his own conduct: if the television was removed during the incident described by Napolez (and nothing shows that it was), Appellant did not enter Pope's residence, but if, on the other hand, the television was removed at another time, nothing shows Appellant had anything to do with this other burglary.

As such, Appellant's conviction cannot stand based on his own conduct.

19

# ARGUMENT

## Standard of Review

In evaluating legal sufficiency, the appellate court reviews all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). The reviewing court examines legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

**Law of Burglary**

Based on the offense as charged in the indictment, a person commits burglary "if, without the effective consent of the owner, the person:

(1) enters a habitation…with intent to commit a…theft; or

[…]

(3) enters a…habitation and commits or attempts to commit a…theft". Tex. Pen. Code § 30.02(a)(1)(3); (I C.R. at 6-7).

For the first method, the *mens rea*—intent—is supplied by the statute itself, while for the second, the culpable mental state is intentionally or knowingly. *Davila v. State*, 547 S.W.2d 606, 608, n.2 (Tex. Crim. App. 1977).

To "enter" means "to intrude: (1) any part of the body; or (2) any physical object connected with the body." Tex. Pen. Code § 30.02(b)(1)(2).

"A person is criminally responsible as a party to an offense if the offense is committed by his own conduct". Tex. Pen. Code § 7.01(a).

**Application**

1. **Appellant did not enter Pope's habitation**

Although the judge's view of the evidence is by no means controlling, here it is correct: the evidence at trial disclosed a single alleged burglary during which Appellant did not enter Pope's habitation. (V R.R. at 166; 221). Danny Napolez is the only witness who testified as to what happened during the alleged burglary, and

his testimony is pithy. According to him, Brittany "said to grab the lawnmower because she said the lawnmower was her's [sic], so Jonathan backed up to it, loaded the lawnmower, then got in the truck and *we waited til she came out*." (V R.R. at 111-112) (emphasis added). Because this is the only evidence given of the burglary itself, it shows that without a doubt Appellant did not enter Pope's residence. As a result, the evidence is legally insufficient to show that Appellant, by his own conduct, committed burglary because the record is devoid of evidence on an essential element of the offense. Tex. Pen. Code § 30.02(a)(1)(3); *Davila*, 547 S.W.2d at 608 (listing elements of burglary under 30.01(a)(3)); (I C.R. at 6-7; 49). This is true under either of ways the burglary was charged to the jury: entering with intent to commit theft, and entering and attempting to commit or committing theft, both require entry, and no evidence shows Appellant entered Pope's residence. Tex. Pen. Code § 30.02(a)(1)(3) and Tex. Pen. Code § 30.02(b)(1)(2).

## 2. Red Herrings: the Carport and the Television

### A. The Carport is not a Habitation or Part of a Habitation

In reaching this conclusion, the Court must avoid two red herrings. First, it is immaterial that Appellant, according to Napolez, stole the trailer and lawnmower. (V R.R. at 111; 114-115). This is because, according to Pope, the trailer and lawnmower were under his carport, (IV R.R. at 26), but an open carport

22

is not a "habitation" (because it is not adapted for the overnight accommodation of persons), Tex. Pen. Code § 30.01(1), nor even an "enclosed structure" that could qualify as a building that, under 30.01(2), could be burgled. *Day v. State*, 534 S.W.2d 681, 685 (Tex. Crim. App. 1976) ("enclosed structure" under Texas Penal Code Section 30.01(2) does not "include…open carports with walls on both sides but none on the ends").

Nor is there any evidence that Pope's carport was a "structure appurtenant to or connected with" his habitation. Tex. Pen. Code § 30.01(1)(B). Pope testified that "[t]o the south side of my house I have a carport and a little shed and I keep it underneath that carport and you can see it as soon as you pull up." (IV R.R. at 26). This brief description does not tell us how close or far the carport is from Pope's habitation, nor whether it is attached or unattached, appurtenant or not, connected with the habitation or not.

Moreover, no Texas court has held in a published opinion that a carport is "appurtenant to or connected with" a habitation; rather, only two unpublished opinions have so held. *Tennyson v. State*, No. 11-92-107-CR, 1993 WL 13141619 at *1-2 (Tex. App. Eastland, June 24, 1993) (not designated for publication) (concluding that a carport attached to a house was a structure connected with the house for purposes of Texas Penal Code 30.01(1)(B)); *Woods v. State*, 01-92-00739-CR, 1993 WL 177627, at *3 (Tex. App.—Houston [1st Dist.] May 27,

23

1993, pet. ref'd) (not designated for publication) (same); *cf. Jones v. State*, 690 S.W.2d 318, 319 (Tex. App.—Dallas 1985, pet. ref'd) (reaching same conclusion regarding unattached garage), *Darby v. State*, 960 S.W.2d 370, 371-372 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd) (same), *and White v. State*, 630 S.W.2d 340 (Tex. App.—Houston [1st Dist.] 1982, no pet.) (attached garage was a structure appurtenant to and connected to the victim's house). But *Tennyson* followed *Darby* and *Jones*, whose reasoning and facts are inapplicable here, and *Woods* followed *White*, whose reasoning and facts are also inapplicable here.

In *Darby*, the unattached garage was "approximately nine feet from [the victim's] house and [was] fully enclosed." *Darby*, 960 S.W.2d at 371. The victim stored "all items which she [could not] store in her house in her garage" and "consider[ed] her garage to be part of her home." *Id.* "In a storage room in the back of the garage, there [was] a bed in which [the victim's] grandson slept for six months." *Id.* The Court concluded that the victim's "unattached garage, which was used to store items she could not store in her house, was 'appurtenant to' her house as the term is defined in *Jones* [*v. State*, 690 S.W.3d 318, 319 (Tex. App.—Dallas 1985, pet. ref'd)]." *Darby*, 960 S.W.2d at 372. Clearly Pope's sparse description of his carport does not include the same level of pertinent details as in *Darby*: we do not know how far the carport is from his house, though the carport

24

is certainly not enclosed;[7] Pope did not testify that he considered the carport a part of his home; he did not testify that he stored all items he could not store in his house under his carport; and nothing shows the carport was outfitted at all for sleeping.

As for *Jones*, that case cherry-picked from the definition of "appurtenant" in *Black's Law Dictionary*. The Dallas court chose, without explaining why, the part of the definition that did not require attachment or physical connection, in favor of the part that did so require. *Jones*, 690 S.W.2d at 319. But neither the language of the statute nor the definition of "appurtenant" cited by *Jones* compel the conclusion that an unattached structure—or at least a carport—is appurtenant to or connected with a habitation. Tex. Pen. Code § 30.01(1)(B).[8] In any event, as a result the *Jones* court concluded a structure is "appurtenant to" a habitation if it is "necessarily connected with the use and enjoyment of the house, and it is secondary or incident to the principal building, the house." *Id.* (internal citations omitted). But even under this definition there is no evidence that Appellant's

---

[7] *See* http://www.merriam-webster.com/dictionary/carport: a carport is "an open-sided automobile shelter by the side of a building". Accessed August 18, 2015.

[8] As "further support" of its holding, the *Jones* court noted that "several commentators" include "garages and other outbuildings" under Section 30.01(1)(B). *Jones*, 690 S.W. at 319-320. However, a carport is not an outbuilding, for an "outbuilding" is "a building (as a stable or a woodshed) separate from but accessory to a main house", http://www.merriam-webster.com/dictionary/outbuilding (accessed August 18, 2015), and a "building" is "a usually roofed and walled structure built for permanent use (as for a dwelling)". http://www.merriam-webster.com/dictionary/building, accessed August 18, 2015. But a carport is "open-sided" (*see* footnote 5, *supra*), not walled, nor do we have enough facts here to know whether Pope's carport might, because of unorthodox design, meet the definition of "outbuilding". (IV R.R. at 111; 114).

carport was "necessarily connected with the use and enjoyment" of his house; because he stored his lawnmower and trailer under the carport, it rather seems as if his carport is necessarily connected with the use and enjoyment of his yard.

This is not mere facetiousness, for it is quite true that the record lacks evidence disclosing how the carport is necessarily connected with the use and enjoyment of Pope's *house*. To see this, we must come full circle. If we are going to accept *Jones'* definition of "appurtenant", then *Darby* shows us what it means for an unattached structure to be "necessarily connected with the use and enjoyment" of the house: storage therein of items that will not fit in the house; use of the garage (or, more broadly, structure) as sleeping quarters; perception of the unattached garage (structure) by the victim as part of his home; proximity to the house; and full enclosure. *Darby*, 960 S.W.2d at 371-372. None of these facts obtain here, unless we assume that the carport was quite close to the house—which would be mere speculation—or that the carport was fully enclosed, which would be unusual, in addition to also being mere speculation. (IV R.R. at 26).

*White* is inapplicable because it considered whether an attached garage without a door could be considered part of a habitation, *White*, 630 S.W.2d at 341-342, and these are not the facts here. Moreover, *White*'s holding is based on the conclusion that burglary of a building requires an enclosed structure, whereas burglary of a habitation does not. *Id.* at 642. Yet even if true, this does not resolve

26

the instant question because the fact that a structure is unenclosed may nevertheless be relevant in determining whether it is part of a habitation. *See Swain v. State*, 583 S.W.2d 775, 777 (Tex. Crim. App. 1979) (no indication the legislature intended "to expand the concept of burglary of a habitation to include an entry upon an unenclosed and unsecured stairway attached to a residence") (comparing *Day v. State*, 534 S.W.2d 681 (Tex. Crim. App. 1976)) *and Jefferson v. State*, 977 So.2d 431, 436-437 (Miss. Ct. App. 2008) ("open, freestanding structure" not a dwelling house or part of a dwelling house under Mississippi statute defining "dwelling house" as "[e]very building joined to, immediately connected with, or being a part of the dwelling house").

Rather, this Court should follow the conclusions of *Swain* (unenclosed and unsecured stairway attached to a residence is not a part of the habitation that can be burgled) and *Day* (carport is not a building that can be burgled), and hold that a carport cannot, at least on these facts, be a habitation or part of a habitation under Texas burglary law.[9] *Swain*, 583 S.W.2d at 777; *Day*, 534 S.W.2d at 685. In this connection, it is significant that when the Court of Criminal Appeals decided in *Swain* that an unenclosed and unsecured stairway attached to a residence did not fall under the purview of the burglary of a habitation statute, the Court supported

---

[9] It is also noteworthy that a collection of cases in the American Law Reports on the topic of "Burglary: outbuildings or the like as part of the 'dwelling house'" contains only one case, the *Jefferson* case from Mississippi cited above, that even considers whether a carport can be part of a habitation (or its equivalent term). 43 A.L.R.2d 831.

27

its conclusion by citing *Day*, which included a carport amongst those structures not falling under the purview of the burglary of a building statute. *Swain*, 583 S.W.2d at 777; *Day*, 534 S.W.2d at 685;[10] Tex. Pen. Code § 30.02(a)(1)(3). The inference the Court made is clearly that an unenclosed and unsecured stairway, even if attached to a residence, is not a part of a residence because such a stairway is like those structures—including a carport—which are not otherwise protected by the burglary statute. *Day*, 534 S.W.2d at 685; *see also St. Julian v. State*, 874 S.W.2d 669, 670 (Tex. Crim. App. 1994) (in burglary of a building case, citing *Day* and thus reiterating that a carport is not a building protected by the burglary statute). If such a stairway is not part of a residence because it is like a carport, then, *a fortiori*, the carport itself will not be part of a residence.

Therefore, stealing the lawnmower and the trailer makes Appellant a thief, but not a burglar.

Still, even if the Court disagrees and holds that the carport is a structure "appurtenant to or connected with" Pope's habitation, the record does not show that Appellant actually entered the carport when he loaded the lawnmower and trailer. (IV R.R. at 26) (V R.R. at 114); Tex. Pen. Code § 30.02(b)(1)(2) ("enter" means "to intrude: (1) any part of the body; or (2) any physical object connected

---

[10] The complete list of examples the Court gives include "open air stages with three walls and a roof, or open carports with walls on both sides but none on the ends, or even four-columned pavilions with no walls". *Day*, 534 S.W.2d at 685.

with the body."). While part of the trailer and lawnmower must have been under the carport, nothing shows Appellant must have entered the carport to hook them up to his truck. (V R.R. at 114). It is possible the trailer protruded beyond the limits of the carport so that Appellant need not have entered the carport to steal the trailer (on which the lawnmower sat). (IV R.R. at 26). At any rate, to conclude anything more requires speculation.

### B. Nothing shows Appellant himself participated in removing the television from Pope's residence, whenever that occurred

The second red herring is that it is immaterial that Pope's television was found in Appellant's trailer because no evidence shows that, when the television was removed from Pope's residence (whenever that was), Appellant had anything to do with it, much less entered the residence to remove it. (V R.R. at 52; 56; 34-37; 72-73). If the television was removed when Brittany emerged from Pope's residence after Appellant loaded the trailer and lawnmower, then clearly Appellant did not enter the residence and thus could not be convicted of burglary based on his own conduct. (V R.R. at 111-112).[11] If, instead, the television was removed at another time, there is no evidence that Appellant had anything to do with that burglary. At best, the television's presence in his trailer could make Appellant guilty of theft under Section 31.03(b)(2) of the Texas Penal Code for appropriating

---

[11] As discussed in Issue Two, however, there is no evidence that Brittany emerged from the residence with anything at all.

stolen property, if he knew the property was stolen by another when he appropriated it. Tex. Pen. Code § 31.03(b)(2); Tex. Pen. Code § 31.01(4)(B). But that, of course, is not the same offense as burglary, and Appellant need not enter any habitation, except his own, to commit it.

## Conclusion

No evidence shows Appellant entered Pope's habitation, and nothing shows Appellant was even present or entered the habitation when the television was stolen, whenever that was. As such, Appellant's conviction cannot stand insofar as it was based on his own conduct as a primary actor.

## SUMMARY OF THE ARGUMENT

ISSUE TWO: The evidence is legally insufficient to support Appellant's conviction for burglary under the law of parties because there is no evidence that Brittany Anderson entered Shane Pope's residence with intent to commit theft, that she in fact committed or attempted to commit theft when she entered the residence, or that there was an agreement with Appellant before the burglary to commit the burglary.

The only direct evidence of Brittany's possible intent when she entered Pope's residence comes from Napolez, who testified Brittany was going to retrieve some of her things from her brother following an argument she had with him. This

alone is not enough to show that she entered Pope's residence with intent to commit theft because one cannot purloin one's own possessions.

Nothing shows Brittany committed or attempted to commit theft after entering Pope's residence. Significantly, Napolez did not testify that Brittany emerged from Pope's residence with anything: nothing shows she burgled Pope's residence at that time. And, according to Napolez, after the burglary he, Brittany, and Appellant returned to Appellant's residence to unload the trailer and the lawnmower—nothing else. In fact, the television was already at Appellant's residence before the alleged burglary described by Napolez occurred. If there was another burglary, nothing connects Appellant to it. Nothing shows Brittany attempted to burgle Pope's residence but failed.

Should the Court disagree that the evidence does not show Brittany emerged from the residence with anything, remember that the State still must show an agreement before the burglary in which Appellant intended to promote or assist the burglary: acts after the fact (such as being present at a forgery) do not show the agreement required for a conviction under the law of parties.

Some potential counterarguments from the State are worth addressing. The fact that the television was found in Appellant's residence does not give rise by itself to an inference of Appellant's guilt, because both Brittany and Appellant resided there. Nothing shows Appellant exercised a "conscious assertion of right

31

to the property" as is also required. Any other suspicious or bad acts evidenced in the record, such pawning the lawnmower or welding the trailer or even being present during the forgery, may show Appellant is complicit in other crimes, but not burglary. The fact that Brittany and Pope were not close siblings might cast doubt on the veracity of her claim to be retrieving her own things following an argument with Pope (or not—if they are not close they might be prone to argue), but this does not show Appellant was unjustified in believing Brittany's reason for going to Pope's house nor that he knew that reason was a pretext (if it was). Finally, that Appellant's alibi witness was apparently not believed by the jury does not alter the fact that the rest of the State's evidence must itself be legally sufficient to sustain Appellant's conviction, and the evidence is not.

## ARGUMENT

### Standard of Review

In evaluating legal sufficiency, the appellate court reviews all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). The reviewing court examines legal sufficiency under the direction of

the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

**Law of Burglary and Law of Parties**

### 1. **Burglary**

Based on the offense as charged in the indictment, a person commits burglary "if, without the effective consent of the owner, the person:

(1) enters a habitation…with intent to commit a…theft; or

[…]

(3) enters a…habitation and commits or attempts to commit a…theft". Tex. Pen. Code § 30.02(a)(1)(3); (I C.R. at 6-7).

For the first method, the *mens rea*—intent—is supplied by the statute itself, while for the second, the culpable mental state is intentionally or knowingly. *Davila v. State*, 547 S.W.2d 606, 608, n.2 (Tex. Crim. App. 1977).

To "enter" means "to intrude: (1) any part of the body; or (2) any physical object connected with the body." Tex. Pen. Code § 30.02(b)(1)(2).

## 2. Law of Parties

"A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." Tex. Pen. Code § 7.01(a). "A person is criminally responsible for an offense committed by the conduct of another if:

[…]

(2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense". Tex. Pen. Code § 7.02(a)(2).

"In determining whether an individual is a party to an offense and bears criminal responsibility therefor, the court may look to events before, during, and after the commission of the offense." *Morrison v. State*, 608 S.W.2d 233, 234 (Tex. Crim. App. 1980). However, "[a]cts committed after the [offense] was completed could not make appellant a party to the offense…[t]he circumstances must prove some culpable act before or during the [offense]." *Id.* at 235. There

must be, "in addition to physical presence, encouragement by words, or agreement to the commission of the offense. Such agreement must be prior to or contemporaneous with the criminal event." *Urtado v. State*, 605 S.W.2d 907, 911 (Tex. Crim. App. 1980).

## Application

1. **There is no evidence that Brittany entered the residence with intent to commit theft, or that, in this regard, Appellant entered into an agreement with Brittany before the burglary to commit the burglary**

Here, only Napolez testified to the events of the alleged burglary. He testified that the impetus for going over to Pope's residence was that Brittany "said she got in an argument with her brother and that she needed to go pick up a few stuff – a few stuff of her's [sic]." (V R.R. at 113). This is the only evidence of Brittany's intent before the alleged burglary.

One way the State committed itself to proving burglary was through entry into Pope's habitation with intent to commit theft. (I C.R. at 49). Of course, a person cannot steal his own property, Tex. Pen. Code § 31.03(a) ("A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property"), so Appellant could not have "inten[ded] to promote or assist the commission of" a non-crime. Tex. Pen. Code § 7.02(a)(2). Since we have no other evidence of Brittany's intent before the alleged burglary, we cannot conclude Appellant is guilty of burglary based on soliciting, encouraging,

35

directing, aiding, or attempting to aid Brittany in the commission of the offense.[12] Tex. Pen. Code § 7.02(a)(2). The evidence shows Appellant committing no culpable act before the alleged offense, and there is no evidence of any agreement prior to the alleged offense, in words or otherwise, to commit burglary. *Morrison*, 608 S.W.2d at 235; *Urtado*, 605 S.W.2d at 911. Rather, there is evidence of an agreement to go over to Pope's house so Brittany could retrieve her own possessions: a trespass, to be sure, but not a burglary.

## 2. There is no evidence that Brittany attempted to commit or did commit theft after entering Pope's residence, that Appellant had anything to do with any other possible burglary of Pope's residence, or that Appellant and Brittany entered into any agreement prior to the burglary to commit the burglary

Now, the other way the State sought to prove Appellant guilty of burglary was by showing, in essence, that Appellant bore some criminal responsibility for Brittany committing or attempting to commit theft after entering Pope's residence. (I C.R. at 49). In contrast to the previous way of proving burglary, where the State must establish the burglar "intended to commit the felony or theft at the time of entry", *Espinoza v. State*, 955 S.W.2d 108, 111 (Tex. App.—Waco 1997, pet.

---

[12] As will be explained shortly, nothing shows Brittany in fact took anything, or even tried to take anything, after she entered the residence. However, even if there were evidence that she had done either of those culpable acts, it would not show that Appellant knew her stated reason for going over to the residence was a pretext, nor would driving them away from the scene of the crime make Appellant a party to burglary. *Morrison*, 608 S.W.2d at 235 ("[a]cts committed after the [offense] was completed could not make appellant a party to the offense"). Furthermore, still lacking would be any evidence of a prior or contemporaneous agreement to commit burglary. *Urtado*, 605 S.W.2d at 911 ("agreement must be prior to or contemporaneous with the criminal event").

ref'd), here the State "must simply prove that the [burglar] intentionally or knowingly entered the building or habitation without the owner's consent and while inside committed or attempted to commit a felony or theft." *Id.* However, there is no evidence here that Brittany committed theft, or attempted to commit theft, after she entered Pope's residence.

First, Napolez does not testify that Brittany emerged from Pope's residence with anything at all. (V R.R. at 111-112). All he says is "we waited til she came out", (V R.R. at 112), but does not testify she came out with anything. She could not have stolen the television during the alleged burglary because Napolez testified the television was already there when he arrived at Appellant's trailer—before the alleged burglary occurred. (V R.R. at 112). After Brittany returned to Appellant's truck, the three went back to Appellant's shop to unload the trailer and the lawnmower—but nothing else. (V R.R. at 142-143). Then, according to Napolez, the three went to the bank where Brittany passed the forged check—but this event could not have occurred on the same day as the alleged burglary because it is indisputable that the forged check was passed on October 7, 2013 at 4:03 p.m. before Pope arrived home from work and before the alleged burglary occurred on October 8, 2013. (IV R.R. at 21) (V R.R. at 26; 112-115; 125-127; 141-145; 147-151) (Defendant's Ex. 1).

Hence, if the State argues that Brittany did not steal the television (or anything else) while Appellant hooked up the trailer and lawnmower, but did steal the checkbooks, it simply is not possible: the day the trailer and lawnmower were stolen, which is the same day Brittany entered Pope's house, is the day *after* the check (which must have come from Pope's residence) was passed—but Napolez was clear that passing the check occurred on the same day as, but after, unloading the trailer and the lawnmower at Appellant's residence. (IV R.R. at 21; 25) (V R.R. at 17; 26; 112-115; 125-127; 141-145; 147-151) (Defendant's Ex. 1). The checkbooks could have been stolen when the lawnmower and trailer were stolen, if they were all stolen on October 8, 2013—but this an impossibility, since the check was passed the day before. (Defendant's Ex. 1). On the other hand, the checkbooks, lawnmower, and trailer could have been stolen at the same time on October 7, 2013—but this is also an impossibility, because Pope testified clearly that on October 7, 2013, when he arrived home from work his house had not been burglarized; that he had the timeframe during which the burglary occurred pinned down precisely; and that when he arrived home on October 8, 2013, he "noticed [his] lawnmower and trailer were missing right off the bat", suggesting that if these had been stolen (along with the checkbooks) on October 7, 2013, before he arrived home, he would not have overlooked their absence. (IV R.R. at 17; 21-26).

If the State retreats to the castle keep and says there were two burglaries,[13] we might not be inclined to quibble except on one crucial point: that nothing shows that Appellant had anything to do with any other burglary of Pope's residence. Even if Appellant truly was present when Brittany passed the forged check, as Johanson testified, this would not show that Appellant burgled Pope's house himself, or that he was criminally responsible for Brittany doing so—we do we not know the facts of this other burglary at all, and acts committed after an offense do not make one a party to that offense. *Morrison*, 608 S.W.2d at 235 ("[a]cts committed after the [offense] was completed could not make appellant a party to the offense"); *Urtado*, 605 S.W.2d at 911 ("agreement must be prior to or contemporaneous with the criminal event") (VI R.R. at 30).

In short, Napolez did not testify Brittany stole anything at all from the residence, nor that she attempted to do so, nor that she entered the residence intending to do so. If there was another burglary of Pope's residence, we know nothing about whether Appellant had anything to do with it.

---

[13] During closing arguments the prosecutor lamented that "unfortunately, [he] didn't' realize...until yesterday" that, due to Appellant's alleged presence on October 7, 2013 when the forged check was passed, "Mr. Pope's house had been burglarized more than once." (VI R.R. at 76). Note that the State's view here does not conflict with that of the trial court that "[c]learly, if there was a burglary, there was a single burglary based on the evidence that's been presented". (V R.R. at 221). There was evidence of only one burglary that, if proven, would inculpate Appellant; but, of course, there could have been multiple burglaries that occurred that had nothing to do with Appellant.

Second, Napolez is unequivocal that the television was already there when he arrived at Appellant's trailer before the events described above occurred. (V R.R. at 112; 126-127). Hence, while the television found in Appellant's residence undoubtedly came from Pope's residence, nothing in the record shows Appellant had anything to do with the television making its way to his place. And because, despite the State's most diligent efforts, (e.g., V R.R. at 112-114), none of the other property stolen from Pope's residence was ever connected to Appellant or found in his trailer, there is simply nothing to show that when Pope's house was burgled and the television removed, Appellant had anything to do with it.[14]

Third, there is no evidence that, even if Brittany did not in fact commit theft during the events described by Napolez, she attempted to do so. Nothing in the record suggests, for example, that she tried and failed ("Man, this is too heavy to carry out…"), that she was interrupted in the middle of thieving property ("It's the cops—run!"), that she could not find what she was looking for ("Let's go home, guys. It's not here."), and so forth.

---

[14] While Napolez testified he received an Explode boombox from Appellant months after the burglary, nothing shows this was the same Explode boombox alleged to have been stolen from Appellant's residence—only speculation could conclude otherwise. (IV R.R. at 27; 32) (V R.R. at 113-114). Similarly, the two pairs of binoculars—one Bushnell and one Simmons—that Investigator Boyd apparently observed in Appellant's trailer were not shown to be the same ones alleged to have been stolen from Pope. (IV R.R. at 31) (V R.R. at 80-82). *See Nichols v. State*, 479 S.W.2d 277, 278 (Tex. Crim. App. 1972) ("It is not sufficient identification to show that goods were of the same brand as those that were stolen.")

Fourth, the State still has to show, not merely that Appellant committed some act in furtherance of the burglary, but that he did so with the intent to promote or assist the burglary, and that he committed this culpable act *before* the burglary occurred pursuant to an agreement with Brittany. *Morrison*, 608 S.W.2d at 235; *Urtado*, 605 S.W.2d at 911; Tex. Pen. Code 7.02(a)(2). Assisting Brittany in leaving Pope's residence after she committed burglary (if she did at that time), would not be enough. *Cf. Haley v. State*, 113 S.W.3d 801, 810-11 (Tex. App.—Austin 2003) ("Standing alone, proof that an accused assisted the primary actor in making his escape is likewise insufficient, although accused's conduct may constitute an independent offense of hindering apprehension or prosecution."). As with the alleged burglary under Texas Penal Code Section 30.02(a)(1), the State cannot show Appellant committed any such culpable act before the burglary pursuant to an agreement: the record is devoid of any such evidence.

### 3. Addressing possible counterarguments from the State

The State may argue that Appellant's undisputed possession of recently stolen property—the television—coupled with his poor explanation for that possession (telling the officers the television belonged to his sister, and Napolez that it belonged to Brittany) shows he is guilty. (V R.R. at 53; 112). However, "recent and unexplained possession of stolen property is merely a circumstance of guilt and is not conclusive." *Hardesty v. State*, 656 S.W.2d 73, 77 (Tex. Crim.

App. 1983). Hence, "once the permissible inference arises, sufficiency of the evidence must still be examined according to applicable evidentiary standards of appellate review since the inference is not conclusive." *Id.*

In conducting the sufficiency review, besides the discussion of the evidence given above, it ought not to be overlooked that while the trailer in which the television was found belonged to Appellant, Brittany lived there as well. (V R.R. at 170) ("Brittany and [Appellant] were an item and she was residing with him in the camper"). Their shared control over the trailer means that the "recent and unexplained possession" is just as attributable to Brittany as to Appellant. *England v. State*, 727 S.W.2d 810, 811 (Tex. App.—Austin 1987, no pet.) ("An inference of guilt of burglary based on the accused's personal possession of stolen goods has not been raised where the stolen property was found in a place where others had an equal right and facility of access."); *Prather v. State*, 128 Tex. Crim. 342, 343, 81 S.W.2d 528, 529 (1935) ("In order to warrant an inference of guilt from the circumstance of possession of recently stolen property, such possession must be personal *and exclusive*, must be unexplained, and must involve a distinct and conscious assertion of property by the defendant… But the house or room must be proved to be in his exclusive occupation. But if it were found lying in a house or room in which he lived jointly with others equally capable of having committed the theft, it is clear that no definite presumption of guilt could be made.") (emphasis

added); *McKnight v. State*, 399 S.W.2d 552, 555 (Tex. Crim. App. 1966) ("The circumstantial evidence, viewed in the perspective most favorable to the state, shows only that appellant exercised joint control of the premises where the stolen property was temporarily stored, and there is no evidence that appellant asserted any control over the stolen property or that he was ever aware that the motor was stolen.").

Moreover, the State has not shown that Appellant a "conscious assertion of right to the property". *England*, 727 S.W.2d at 812. He never claimed the television was his; in fact, he claimed his television was outside on the ground, and the State's own witness confirmed there was a "TV outside on the ground". (V R.R. at 41). Although Appellant denied having a 55-inch television in his trailer, saying a television that large would not fit, it is undisputed that both he and one of the officers initially thought the television in his trailer was 42 inches—hence Appellant's denial was, in fact, truthful. (V R.R. at 52; 72). And we should not forget that it was Brittany who obstructed the officers from entering the trailer, but Appellant who helped them by beginning to pry the door open with a screwdriver—hardly the act of someone trying to conceal the fruits of a burglary. (V R.R. at 38-39; 171-172).

As for selling the lawnmower to Glen Jolly, welding the trailer, allegedly fabricating a receipt for the purchase of the trailer and lawnmower, and allegedly

43

being present during the passing of the forged check (or possibly even endorsing it), (V R.R. at 94-97; 99; 118-120; 150-151) (VI R.R. at 29-30; *but see* 30) (Defendant's Ex. 2 and 7; State's Ex. 30), each of these actions might be consistent with complicity in some form of wrongdoing—receiving stolen property, forgery, receiving a stolen check, etc.—but none of them establish Appellant's complicity in a burglary of Pope's residence. For actions taken regarding the lawnmower and trailer, these are oriented towards concealing and profiting from theft, whether committed by Appellant or others, but they are not, in light of the rest of the evidence discussed above, enough to establish Appellant's complicity in a burglary of Pope's residence. Neither does being present when a forged check is passed show that Appellant was present when that check was stolen from a habitation; even forging the check himself (if that occurred) shows only that Appellant committed forgery, not that he stole the check from Pope's residence or was criminally responsible as a party for doing so. And even if these facts raise permissible inferences of guilt, those are offset by the careful sifting of the evidence done above.

The State may also seize on the facts that Brittany and Pope were not close and Pope did not even think Brittany had ever visited his house, making it unlikely that any of her things would be in Pope's residence, and thereby casting doubt on her claim to be going to retrieve her own belongings. (IV R.R. at 19-20) (V R.R.

44

at 23-24). Well and good, but it does not show that *Appellant* was unjustified in believing Brittany's claim to repossessing her own possessions, or that he knew her claim (offered by the State through Napolez, not by a defense witness) was false: after all, he must have visited Brittany's parents' house at the same time Pope was there, so he knew they had some relationship. (V R.R. at 18-19). And even if that relationship was a poor one or virtually non-existent (IV R.R. at 20), it only lends credence to Brittany's claim that she got in an argument with her brother. (V R.R. at 113).

Finally, we have the fact that Appellant's alibi witness, Bobby Wisdom, delivered testimony that was apparently not believed by the jury. (VIII R.R. at 9-10). It is not clear, however, why the fact that the jury failed to believe an alibi witness should have any effect on whether the evidence was otherwise sufficient to support Appellant's conviction. The evidence to establish each element of the offense beyond a reasonable doubt must itself survive a "rigorous application of the *Jackson v. Virginia* standard", *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010), and whether the jury believed Wisdom's testimony of Appellant's whereabouts on October 7, 2013 (the day the alleged burglary as described by Napolez could not have occurred), or even his testimony regarding being called to unload a television later that night at Appellant's residence (a fact which, even if false, would not show that Appellant had anything to do with the

burglary), seems to have no bearing on the question of whether the State carried its independent burden to present legally sufficient evidence to obtain a conviction.

## Conclusion

There is no evidence that, when Brittany entered Pope's habitation, she intended to commit theft. Quite the opposite: based on the only evidence presented, she intended to re-appropriate her own goods, not appropriate someone else's. There is also no evidence that Brittany emerged from the residence having stolen anything, nor that she even attempted to steal anything during her time in the residence. And if there was another burglary on the same or another day, nothing shows Appellant was complicit therein. As a result, the evidence is legally insufficient to sustain Appellant's conviction under the law of parties.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Appellant asks this Court to REVERSE the trial court's judgment and RENDER a judgment of acquittal.

Respectfully submitted:

/s/ Justin Bradford Smith
Justin Bradford Smith
Texas Bar No. 24072348

Harrell, Stoebner, & Russell, P.C.
2106 Bird Creek Drive
Temple, Texas 76502
Phone: (254) 771-1855
FAX: (254) 771-2082
Email: justin@templelawoffice.com

ATTORNEY FOR APPELLANT

## CERTIFICATE OF COMPLIANCE

I hereby certify that, pursuant to Rule 9 of the Texas Rules of Appellate Procedure, Appellant's Brief contains 9,507 words, exclusive of the caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, and certificate of compliance.

/s/ Justin Bradford Smith
Justin Bradford Smith

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2015, a true and correct copy of

Appellant's Brief was forwarded to the counsel below by eservice:

Gary W. Bunyard
Llano County Assistant District Attorney
P.O. Box 725
Llano, Texas 78639
Telephone:  (325) 247-5755
Fax:  (325) 247-5274
Email:  g.bunyard@co.llano.tx.us

/s/  Justin Bradford Smith
Justin Bradford Smith